COMMONWEALTH OF
MASSACHUSETTS,
Plaintiff,

v.

BLACKSTONE VALLEY ELECTRIC
COMPANY, et al., Defendants.

Civ. A. No. 87–1799–T.

United States District Court,
D. Massachusetts.

Dec. 20, 1992.

Robert W. Ritchie, Karen A. McGuire, Atty. General's Office, Boston, MA, for plaintiff.

Stephen M. Leonard, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, John Voorhees, Christine M. Gravelle, Peter J. McGinn, Tillinghast, Collins & Graham, Providence, RI, Patrick W. Hanifin, New England Legal Foundation, Boston, MA, for defendants.

## MEMORANDUM

TAURO, Chief Judge.

The Commonwealth of Massachusetts ("Commonwealth") cleaned up a blue sludge containing ferric ferrocyanide ("FFC") from a site located at Mendon Road in Attleboro, Massachusetts and now seeks to recover part of the cleanup costs from defendants Blackstone Valley Electric Company ("Blackstone") and Courtois Sand and Gravel Company ("Courtois"), pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9657. This court previously granted the Commonwealth's motion for partial summary judgment, ruling that the FFC contained in the blue sludge is a hazardous substance within the meaning of Section 101(14) of CERCLA. *See Massachusetts v. Blackstone Valley Elec. Co.,* 777 F.Supp. 1036 (D.Mass.1991).

Presently at issue is the Commonwealth's motion for partial summary judgment on the remaining liability issues, as to Blackstone, the alleged generator of the hazardous waste, and Courtois, the company that transported Blackstone's waste to the site.

I

*Summary Judgment*

A court is entitled to grant summary judgment where there is no genuine issue as to any material fact, and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Aponte–Santiago v. Lopez–*

*Rivera,* 957 F.2d 40 (1st Cir.1992). In order to grant the Commonwealth's motion and impose liability against Blackstone and Courtois, this court must find that there are no genuine issues of material fact as to the following:

(1) that the Mendon Road site is a "facility" under CERCLA, and/or a "site" under Mass.Gen.L. ch. 21E;

(2) that there has been a "release" or "threatened release" of a hazardous substance under CERCLA—or, for purposes of Mass.Gen.L. ch. 21E, a hazardous material—from or at the site;

(3) that Blackstone is a generator of a hazardous substance or material; and

(4) that Courtois is either a transporter of hazardous waste, an owner of a portion of the Mendon Road site or both a transporter and an owner.

The burden here is upon the Commonwealth to "put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554).

## A.  FACILITY/SITE

■ "Facility" is defined in Section 101(9)(B) of CERCLA as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). The analog under Mass. Gen.L. ch. 21E is a "site," defined as any "place or area where oil or hazardous material has been deposited, stored, disposed of or placed, or otherwise come to be located." Mass.Gen.L. ch. 21E, § 2.

The Commonwealth has established that material contaminated with FFC is present at the Mendon Road site. This court ruled earlier that FFC is a hazardous substance within the meaning of CERCLA.[1] Accordingly, the Mendon Road site is a "facility" within the meaning of CERCLA and a "site" within the meaning of Mass.Gen.L. ch. 21E.

## B.  RELEASE

■ CERCLA and Mass.Gen.L. ch. 21E define release as "any spilling, leaking, pumping, pouring, leaching, dumping or disposing into the environment." 42 U.S.C. § 9601(22); Mass.Gen.L. ch. 21E, § 2. As defined under CERCLA, "environment" includes "surface water, groundwater, drinking water supply, land surface or surface strata, or ambient air." 42 U.S.C. § 9601(8). "Environment" is similarly defined under Mass.Gen.L. ch. 21E, § 2. Blackstone does not contest that FFC was found at the Mendon Road site. Accordingly, the presence of FFC at the Mendon Road site establishes that a release did in fact occur.

## C.  BLACKSTONE'S LIABILITY AS A GENERATOR

■ "Generator" liability under Section 107(a)(3) of CERCLA is imposed upon "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment" of hazardous substances to a hazardous waste facility. *See* 42 U.S.C. § 9607(a)(3). Section 5(a)(3) of Mass.Gen.L. ch. 21E similarly imposes liability upon "any person who by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage of hazardous material...." *See* M.G.L. c. 21E, § 5(a)(3).

■ To establish generator liability, the Commonwealth need only show that (i) a generator's waste was shipped to a facility; and (ii) hazardous substances similar to those contained in the defendant's waste remained present at the time of release. *See United States v. Monsanto Co.,* 858 F.2d 160, 169 & n. 15 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Both requirements have been satisfied as to Blackstone.

### i.  *Shipping of Blackstone's Hazardous Waste to the Site*

First, it is undisputed that Blackstone made arrangements with Courtois for dis-

---

**1.** By virtue of this court's November 21, 1991 ruling, the material found at the site is also a "hazardous material" within the meaning of Mass.Gen.L. ch. 21E. The term "hazardous material" includes all "hazardous substances" under CERCLA. *See* Mass.Gen.L. ch. 21E, § 2.

posal of waste from its gas production operation, and that Courtois hauled some of this waste to the Mendon Road site. Viewing the record in a light most favorable to Blackstone, the relevant additional facts are as follows. Blackstone is a public utility originally incorporated as the Blackstone Valley Gas & Electric Company ("BVG & E"). From at least 1920 to 1961, BVG & E owned and operated a facility in Pawtucket, Rhode Island, where it manufactured gas. During gas manufacturing operations at the facility, various wastes were produced, including wood chips, coke, tar, ash, slag and by-products containing oxides. Some of the oxides were used as part of a purification process in which manufactured gas was pumped through boxes containing wood chips. Blackstone's expert, Dr. George Anastos, and the Commonwealth's expert, Dr. James Porter, agree that FFC was a by-product of this purification process. In addition, Blackstone admits that at least one of the substances generated at the gas manufacturing facility was FFC. FFC has a bluish color.

In the 1930s and 1940s, Albert Courtois hauled some of Blackstone's waste to the property that Courtois operated as a sand and gravel pit on Mendon Road. When he visited the Pawtucket gas facility with his sons, Raymond and Normand, they saw a blue substance being removed from purifier tanks and loaded onto Courtois trucks.

Edward Szpila worked as a truck driver for Courtois between 1931 and 1934 during which time he recalls seeing men at the Pawtucket facility chipping blue material out of a tank. According to Szpila, employees from the gas facility sometimes directed him to take loads of waste to "Courtois," which Szpila understood to mean the Courtois' sand and gravel pit at Mendon Road. He estimates that he dumped waste material from the Pawtucket facility, some of which was blue, at the Mendon Road site anywhere from fifty to over a hundred times. Courtois never hauled waste produced by any other gas company or generator to the Mendon Road site.

Blackstone's contention is that a genuine issue of material fact exists as to whether *hazardous* waste was ever included in its waste shipments to the Mendon Road location. This court examined that specific issue at a hearing on October 23, 1992. The court asked counsel for Blackstone whether they had any evidence to suggest that none of its hazardous waste had ever been taken to the Mendon Road site. Counsel informed the court that they did not. They asserted, however, that the Commonwealth had failed to satisfy their burden of showing that the hazardous waste found at the site originated with Blackstone. Upon review, this court finds sufficient evidence to conclude that at least some of the hazardous waste found at the Mendon Road site originated with Blackstone.

■ Importantly, generator liability does not turn on the disposal of a particular quantity of a hazardous substance. *See, e.g., United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 537–39 (N.D.N.Y. 1991). In order to raise a material issue, therefore, Blackstone must point to evidence indicating that none of its FFC was disposed of at Mendon Road. Whether Szpila hauled some of Blackstone's hazardous waste to another location is irrelevant to Blackstone's liability for contamination of the Mendon Road site. Similarly, whether Szpila hauled any non-hazardous waste to the Mendon Road site is immaterial. *See, e.g., United States v. Kramer*, 757 F.Supp. 397, 423 (D.N.J.1991) (rejecting a similar argument). The first *Monsanto* requirement is thus satisfied.

### ii. *Presence of Hazardous Substances at the Site Similar to those in Wastes from the Pawtucket Facility*

The second requirement under *Monsanto* for generator liability is that hazardous substances like those generated at the Pawtucket facility must have been present at the Mendon Road site at the time of release. The Commonwealth, however, need not "match the waste found to each defendant as if it were matching fingerprints." *United States v. Ottati and Goss, Inc.*, 630 F.Supp. 1361, 1402 (D.N.H.1985) (citations omitted); *see Monsanto*, 858 F.2d at 169–70. Because Blackstone admits that

by-products of its gas manufacturing operations contained FFC, and that FFC was found at the Mendon Road site, the second *Monsanto* requirement is satisfied. Accordingly, Blackstone is liable as a generator under both CERCLA and Mass.Gen.L. ch. 21E.

### D. COURTOIS' LIABILITY AS A TRANSPORTER/OWNER

■ Courtois admits that it hauled waste for Blackstone and dumped that waste at its Mendon Road sand and gravel pit. Having determined that the waste contained FFC, this court finds that Courtois is liable under Section 107(a)(4) of CERCLA as a person who accepted hazardous substances for transport to a disposal facility. Courtois is also liable under Section 5(a)(4) of Mass.Gen.L. ch. 21E as a person who directly or indirectly transported hazardous material to a disposal site.

■ Furthermore, Courtois is liable pursuant to Section 107(a)(1) of CERCLA and Section 5(a)(1) of Mass.Gen.L. ch. 21E, as an owner of a portion of the Mendon Road site from or at which there has been a release or threat of release. The company currently holds legal title to one of the lots located at the site which contains hazardous waste.

## II

### *Response Costs*

■ A final issue raised by Blackstone concerns how its portion of response costs in this case should be calculated. Under CERCLA, a Remedial Investigation/Feasibility Study ("RI/FS") must be conducted following the identification of a hazardous waste site. *See* 42 U.S.C. § 9605. CERCLA next requires that generator defendants be given notice of cleanup efforts and access to and an opportunity to comment on the RI/FS work plan and data. *See United States v. Seymour Recycling Corp.,* 679 F.Supp. 859, 864 (S.D.Ind.1987). This important input becomes part of an administrative record from which the response costs owed by individual defendants can eventually be calculated.

■ In this case, the Commonwealth began its cleanup of the Mendon Road site during the winter and spring of 1985–86. Blackstone, however, only received notice of these efforts in November of 1986. Accordingly, Blackstone claims that its due process rights would be violated by having to pay for remediation efforts it knew nothing about and which related to cleanup procedures over which it had no input or control. *See id.* at 864. The Commonwealth admits that Blackstone had no actual notice of the cleanup efforts, but claims that the notice given to others who were eventually linked to Blackstone satisfies all due process requirements. Commonwealth's Supp.Mem. at 5 ("Due process ... does not require actual notice to and participation by all defendants in the remedy selection process."). This court disagrees and considers the notification of others irrelevant to Blackstone's rights.

Blackstone's important constitutional rights can best be guarded now by supplementing the administrative record to include Blackstone's input for the period in which it was not formerly a part of the remedy selection process. The appropriate forum for such supplementation, however, is the agency, not the reviewing court. *See United States v. Charles George Trucking Co.,* 31 Env't.Rep.Case. 1512 (D.Mass.1990) (Woodlock, J.). Accordingly, this matter should be remanded to the Massachusetts Department of Environmental Protection ("DEP") for further development of the administrative record as it relates to the selection of response actions at the Mendon Road site.

## III

### *Conclusion*

For the foregoing reasons, the Commonwealth's Motion for Partial Summary Judgment on Remaining Liability Issues is allowed. On the issue of response costs, this court orders that the entire administrative record be remanded to the DEP so that it may be supplemented in a manner consis-

tent with this memorandum and the accompanying Order.

An Order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, the Commonwealth's Motion for Partial Summary Judgment on Remaining Liability Issues is hereby ALLOWED. As to the issue of response costs, the entire Administrative Record is hereby REMANDED to the Department of Environmental Protection ("DEP") so that it may be supplemented as follows:

1. The DEP shall supplement the Administrative Record to include additional information, if any, on which DEP based or could have based its selection of response actions at the site in light of comments submitted by Blackstone. The additional information, including the arguments, presentations and submissions of Blackstone and any responses of DEP shall be confined to facts and circumstances known or knowable at the time the response actions were selected, up to and including March 1986. Supplementation shall not relate to the costs incurred or to be incurred by DEP at the site.

2. Within three months of the date of this Order, DEP shall hold one or more meetings at or near the Mendon Road site. DEP shall designate to attend such meetings appropriate persons—including but not limited to employees of DEP or outside contractors—involved in selecting the response actions or preparing the reports relied upon in selecting the response actions. During such meetings, DEP shall present a description of the selected response actions and provide an opportunity for Blackstone to comment on the selected response actions. The opportunity to comment at such meetings shall be limited to Blackstone. DEP shall keep a transcript of such meetings and will make the transcripts part of the administrative record. Any comments of Blackstone not confined to facts or circumstances known or knowable before March 1986 shall not constitute part of the administrative record.

3. For thirty days following the date of the last meeting described in paragraph 2, DEP shall accept and consider written submissions by Blackstone and shall make such submissions part of the administrative record. Any written submissions of Blackstone not confined to facts or circumstances known or knowable before March 1986 shall not be considered by DEP and shall not constitute a part of the administrative record. DEP need not accept or consider the written submissions of any person other than Blackstone. Any responses DEP makes to Blackstone's submissions shall be included in the administrative record.

4. Within six months of the date of this Order, DEP shall certify to this court a supplemented administrative record incorporating matters which are the subject of the remand. At that time, DEP shall also advise the court of any response costs for which it no longer intends to seek reimbursement from the defendants.

IT IS SO ORDERED.